UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF THE PAINTERS UNION
DEPOSIT FUND,

        Plaintiff,                       Case number 03-73716
                                              Honorable Julian Abele Cook, Jr.

v.

HARRISON CONSTRUCTION COMPANY and
KEITH PENNER,

        Defendants.

ORDER

The following findings of fact and conclusions of law in the above-entitled case are submitted pursuant to Federal Rule of Civil Procedure 52(a).

1.     Jurisdiction

The jurisdiction of this litigation is predicated upon Sections 502(a)(3) and 515 of the Employee Retirement Income Security Act of 1974, as amended (29 U.S.C. 1132 and 1145), and Section 301 of the Labor Management Relations Act of 1947, as amended (29 U.S.C. 184).

2.     Findings of Fact

This lawsuit was initiated by the Plaintiff, Trustees of the Painters Union Deposit Fund ("Trustees"), against the Defendants, Harrison Construction Company ("Harrison")[1] and Keith

---

[1] On November 17, 2003, Harrison filed for protection under the United States bankruptcy laws. By virtue thereof, the claims by the Trustees in this Court have been stayed pending a final resolution of the bankruptcy proceeding. Hence, the issues of liability, if any, of Harrison to the Trustees are moot. It should be noted that the Trustees filed a proof of claim in the sum of $45,683.25 in Harrison's bankruptcy litigation..

Penner,[2] for unpaid fringe benefit contributions and liquidated damages on the basis of a collective bargaining agreement with the Painters District Council No. 22 of the International Brotherhood of Painters and Allied Trades, AFL-CIO.[3]

On January 7, 1999, Penner signed a collective bargaining agreement on behalf of Harrison in his official capacity as an officer of the company. He also signed this document in his individual capacity as a personal guarantor for Harrison which reads in pertinent part, as follows:

> In consideration of the execution of this collective bargaining agreement by Painters District Council No. 22, the undersigned (and each of us) hereby agrees to guaranty and to be personally liable for the wages and all other payments required by the terms of this collective bargaining agreement, as long as any of the undersigned, maintains any ownership or management interest in the Harrison Construction Company Co. [sic], signatory to this collective bargaining agreement.
>
> The undersigned, and each of us, further understands that this collective bargaining agreement between Painters District Council No. 22 and Harrison Construction Company Co. [sic], is not transferable and will be cancelled by Painters District Council No. 22 as soon as any significant ownership or management interest in the Harrison Construction Company Co., occurs, unless prior approval of the District Council is obtained.

This collective bargaining agreement required, among other things, the employer to transmit all payments to the Trustee on or before the 15th day of every month that followed an accrual of a worker's fringe benefits.[4]  However, when Harrison began to experience financial difficulties in December 2002, Henry Bell[5] became more actively involved in the financial affairs of the

---

[2]Penner served as the vice president and treasurer of Harrison from 1989 until his discharge in September 2003. During Penner's tenure with the company, his responsibilities included accounting, administration, and human resources.

[3]This collective bargaining agreement remained in effect until October 31, 2003.

[4]According to the terms of the parties' collective bargaining agreement, "fringe benefit liability" accrues incrementally as the hours of work are performed by the union employees.

[5] During all of the times that are relevant to this controversy, Bell maintained an eighty eight percent stock interest in the company and served as its president and secretary.

company. By March of the following year, he began to assume some of the accounting responsibilities that had been previously delegated to Penner. In this new role, he identified the bills to be paid and served as his company's negotiator in developing two forbearance agreements with Bank One, a local banking institution.[6] However, when Harrison's financial problems continued to mount and it became readily apparent to Bell that the company would be unable to continue its business operations, he initiated a process which resulted in the termination of the company.

On November 21, 2003 and following an examination of Harrison's financial records, Scott Rellinger, the Trustees' auditor, concluded that the company had failed to make the requisite fringe benefit contributions in the amount of $84,688.44 for hours worked by its union employees. According to this audit and on the basis of the language in the collective bargaining agreement, the Trustees determined that (1) the unpaid benefit contributions represented a total of 7868.5 hours worked by union employees during the months of May through September 2003,[7] and (2) Harrison owed the total sum of $101,626.13 which included an assessment of $16,937.89 in liquidated damages.

As of this date, the Trustees have received only $55,942.88, leaving an unfulfilled balance of $45,683.25[8] to be paid by either or both of these Defendants. When the demands for payment were not met by the Defendants, this lawsuit followed.

---

[6]The forbearance agreements bore the dates of May 1, 2003 and August 1, 2003.

[7]According to the Rellinger audit, the number of hours that were worked by union employees for which fringe benefits were not paid are as follows: May (1696 hours); June (1994 hours); July (2012.5 hours); August (1452 hours); and September (714 hours).

[8]The parties have agreed that the total amount of benefit contributions that are allegedly due and owing to the Trustees is $45,683.25.

3.     Conclusions of Law

With recognition by the parties that the issue of Harrison's liability in this case had been rendered moot by the United States bankruptcy laws, much of the trial testimony and documentary evidence was focused upon the issue of Penner's fiscal responsibility, if any, to the Trustees for the $45,683.25 indebtedness. Thus, there appear to be two questions that must be answered by the Court. First, is Penner contractually liable to the Trustees in this case? If the answer is yes, the Court must turn to the second question; namely, what is the amount of Penner's financial obligation to the Trustees?

In addressing the first question, Penner denies that he has any contractual obligations to the Trustees under the Harrison/Painters District Council 22 collective bargaining agreement. It is axiomatic that a written contract is only ambiguous if, after reading of the entire document, its language could be subject to reasonably conflicting interpretations. *Bianchi v. Automobile Club of Michigan*, 437 Mich. 65, 70 (1991). On the other hand, if a contract is clear and unambiguous, it must be enforced as written according to its plain meaning. Under such circumstances, a court "does not have the right to make a different contract for the parties or look to extrinsic testimony to determine their intent." *UAW-GM Human Res. Center v. KSL Recreation Corp.*, 579 N.W.2d 411, 414 (Mich. Ct. App. 1998); *Clevenger v. Allstate Ins. Co.*, 505 N.W.2d 553, 557 (Mich. 1993).

In this case, Penner, in signing the guaranty, agreed "to be personally liable for the wages and all other payments required by the terms of this collective bargaining agreement...." Moreover, when signing this guaranty, Penner assured those who executed the guaranty agreement on behalf of the Painters District Council No. 22 that he would "stand behind" Harrison with regard to "wages and all other [required] payments." It is indeed unfortunate for Penner, whose personal relationship with Bell became extremely strained over the years with the company, that he must

now assume the liability of Harrison's business obligations alone. Nevertheless, this language is unmistakably clear and cannot be subject to any reasonable conflicting interpretations. It is also clear to the Court that this guaranty imposes liability for all wages or payments that are required under the collective bargaining agreement.

Article XVIII, section 3 of the collective bargaining agreement provides for liquidated damages to be assessed upon the failure of an employer to make timely benefit payments. Since the language of the personal guaranty are equally clear and unambiguous, these terms and conditions must be enforced by the Court as written. *See UAW-GM Human Res. Center*, 579 N.W.2d at 414. Therefore, the liability that is imposed on Penner as a result of the personal guaranty also extends to liquidated damages. Thus, the Court answers the first question by declaring that Penner is liable to the Trustees.

Turning to the second question, the record indicates that the fringe benefit payments which accrued in August and September 2003 did not become due until after Penner's departure from the company. The benefit payments which accrued in August 2003 did not become due until September 15th. It is also true that the benefit payments which accrued in September 2003 did not become due until October 15th of the same year. Therefore, Penner is not liable for those unpaid benefit contributions which became due after his termination from service with the company on September 14, 2003 (i.e., the August and September benefit payments).

However, Penner is liable for those unpaid benefit contributions that accrued in May through July 2003. The total number of hours worked for which benefit contributions were not paid in May through July 2003 is 5702.5, representing seventy-two percent of the total number of unpaid hours worked. The total amount of liability for unpaid benefit contributions for hours worked by union employees is $101,626.13. Trustees have received payment in the amount of

$55,942.88, leaving a balance due and owing of $45,683.25. Seventy-two percent of the remaining liability is $32,891.94. Therefore, Penner is personally liable to the Trustees for unpaid benefit contribution in the amount of $32,891.94.

    IT IS SO ORDERED.

DATED:    <u>September 7, 2005</u>              <u>s/ Julian Abele Cook, Jr.</u>
            Detroit, Michigan              JULIAN ABELE COOK, JR.
                                              United States District Judge

<u>Certificate of Service</u>

    I hereby certify that on September 7, 2005, I electronically filed the foregoing with the Clerk of the Court using the ECF system, and I further certify that I mailed a copy to the non-ECF participant(s).

                                                              <u>s/ Kay Alford</u>
                                                               Courtroom Deputy Clerk